**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JERRY PATRICK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 06-CV-3780 |
| | ) | |
| CITY OF CHICAGO, a municipal | ) | Judge Robert M. Dow, Jr. |
| corporation, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Jerry Patrick ("Patrick") was discharged from his employment with the City of Chicago ("City") following his arrest in 2004. The first two counts of his amended four-count complaint assert state law claims directed solely against the City: Count I is a "Petition for Writ of Certiorari" seeking reversal of the City of Chicago Personnel Board ("Personnel Board") order upholding Plaintiff's discharge and Count II requests a "Writ of Mandamus" ordering the City to comply with certain rules and to reinstate Plaintiff. The remaining two counts name, in addition to the City, Miguel d'Escoto ("d'Escoto"), William Marback ("Marback"), James Taggart ("Taggart"), and George Catezone ("Catezone") in both their individual and official capacities for their role in Plaintiff's termination:[1] Count III is a Fifth Amendment claim brought pursuant to 42 U.S.C. § 1983 and Count IV is another Section 1983 claim for invasion of privacy.[2]

---

[1] Others originally were named as Defendants, but since have been dropped from the lawsuit.

[2] In an opinion dated March 28, 2007 [36], Judge Leinenweber dismissed Count II to the extent that it was based on a claim that the City did not follow its personnel rules. In the same decision, Judge Leinenweber dismissed Plaintiff's official capacity claims against the individual Defendants as well as any claim for supervisory liability against Defendant d'Escoto.

Before the Court are Defendants' and Plaintiff's cross-motions for summary judgment on all counts of Plaintiff's amended complaint pursuant to Fed. R. Civ. P. 56. In this opinion, the Court addresses the federal claims in Counts III and IV on the merits. For the reasons set forth below, the Court grants Defendants' motion for summary judgment [107] and denies Plaintiff's cross-motion for summary judgment on those claims. In view of that disposition of the federal claims, Plaintiff's state law claims – Counts I and II of his amended complaint – are dismissed without prejudice pursuant to "usual practice" in the Seventh Circuit when "all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999).

## I.      Facts

Patrick was appointed to the position of Cement Mixer with the City's Department of Streets and Sanitation ("CDSS") on June 28, 1984. Def. SOF ¶ 1. From January 1, 1993 until his discharge on March 31, 2005, Patrick was employed as a Cement Mixer with the City's Department of Transportation ("CDOT"). *Id.* As a Cement Mixer, Patrick was a member of Local No. 76 of the Cement Worker's Union/Laborer's International Union of North America ("Local No. 76") and the terms and conditions of his employment were governed by the provisions of the Collective Bargaining Agreement ("CBA") between Local No. 76 and the City. *Id.* ¶ 2. While off-duty on Sunday, May 16, 2004, Plaintiff was arrested for possession of a controlled substance, specifically crack cocaine, by Chicago Police Department ("CPD") officers, who notified the City's Inspector General's Office ("IGO") of Plaintiff's arrest. *Id.* ¶ 19.

*The Interview*

Plaintiff subsequently was interviewed on July 13, 2004 by Individual Defendants and IGO Investigators Marback and Taggart. Def. SOF ¶ 47.[3] Marback advised Plaintiff of his "administrative rights," which Marback testified are given to City employees accused of misconduct – that is, if the IGO is "strictly investigating whether or not there were violations of the Personnel Rules of the City of Chicago." *Id.* ¶ 48. Despite the fact that criminal charges were pending, the Inspector General ("IG") for the City of Chicago at that time, Alexander Vroustouris ("Vroustouris"), decided that Plaintiff would be read "administrative rights" because the IGO was not going to seek a criminal prosecution of Plaintiff. Pl. SOF ¶ 115. Another IGO employee present at the interview, William Kirby, testified that there was a "criminal aspect" as well as an "administrative aspect" to Plaintiff's situation. *Id.* The union president representing Plaintiff at the interview requested that the IGO comply with Paragraph 4.3(H) of the CBA and give Plaintiff his criminal rights at the interview or cancel it. *Id.* ¶ 116. The interview went forward. *Id.*

Section 4.3(H) of the CBA between the City and Local No. 76, entitled "Conduct of Disciplinary Investigations," states:

> (1) If the allegation under investigation indicates a recommendation for discipline is probable against the employee, said employee will be given the statutory administrative proceeding rights prior to the commencement of the interview. (2) If the allegation indicates that criminal prosecution may be probable against said employee, the provisions of this Section shall be inapplicable and said employee will be afforded his constitutional rights concerning self-incrimination prior to the commencement of the interview. An employee will not be read his/her administrative and Miranda rights at the same interview.

Def. SOF ¶ 75. IGO criminal investigations are procedurally managed with an eye to prosecuting the individual criminally. *Id.* ¶ 91. An administrative investigation by the IGO is

---

[3] The following facts regarding the interview are taken largely from the testimony provided during Plaintiff's hearing before the Personnel Board, discussed below.

undertaken and procedurally managed with the focus on whether disciplinary action – not criminal prosecution – is appropriate against a City employee. *Id*. ¶ 92. Vroustouris testified that a criminal investigation is not undertaken if an individual already has been arrested. *Id*. ¶ 91. Section 4.3(O)(1) of the CBA provides:

> Any evidence or information including employee statements that is obtained in violation of the rights enumerated in this Section 4.3, shall be suppressed and shall not be used by the Employer for any disciplinary action against the employee, or in the case of promotions or transfers.

*Id*. ¶ 76.

Plaintiff agreed that Marback advised him of his "administrative rights" and that he responded "yes" when asked "Do you understand that if you refuse to answer any questions put to you, you'll be ordered by a superior officer to answer the questions. Do you understand that?" Def. SOF ¶ 54. Plaintiff also answered "yes" when asked: "Do you understand that if you persist in your refusal after the order has been given to you, you are advised that such a refusal constitutes a violation of the Personnel Rules of the City of Chicago, Rule XVIII, Section 1, paragraph 25, and may serve as a basis for which your discharge will be sought. Do you understand that?"; and "Do you understand that by law any admission or statement made by you during the course of this interview and the fruits thereof cannot be used against you in a subsequent criminal proceeding; do you understand that?" *Id*. ¶¶ 55-56. Marback testified that the IGO does not have the power to bring criminal charges, but it can grant "use immunity" from state prosecution for statements made during the course of an administrative interview. *Id*. ¶ 52.[4] Although Marback testified that absent a court order or subpoena, it would be improper for the IGO to forward an administrative interview to the State's Attorneys Office, the Chicago Municipal Code ("CMC") does not require that formality if the files and reports are divulged to

---

[4] The IGO did not have the power to grant transactional immunity. Pl. SOF ¶ 112.

the U.S. Attorney, Illinois Attorney General, or Cook County State's Attorney.  *Id.*; Pl. Resp. ¶ 52.

Before any city officials asked Plaintiff any questions, Plaintiff's supervisor, Defendant Catezone, entered the room and instructed Plaintiff to cooperate and answer all questions truthfully and completely and advised Plaintiff that his failure to do so may result in discipline. Def. SOF ¶ 50.  Specifically, Catezone told Plaintiff, "As your superior, I'm ordering you to cooperate with the IGO of the City of Chicago and answer all questions put to you truthfully and correctly" and "Pursuant to the Personnel Rules of the City of Chicago, your failure to obey my order may serve as a basis for which your discharge would be sought."  *Id.* ¶ 64.  Immediately after making that statement, Catezone exited the interview room and returned to work because he was told he was not needed for anything further.  *Id.* ¶ 100.  Catezone did not know whether the questions asked during the interview would be specifically, directly, and narrowly related to Plaintiffs official job duties before he directed Plaintiff to answer.  Pl. SOF ¶ 117.

Vroustouris left to Marback and Taggart's discretion what questions to ask during Plaintiff's interview.  Pl. SOF ¶ 118.  During the July 13, 2004 interview, Plaintiff answered questions relating to his date of birth, social security number, job title and duties and where he lived.  Def. SOF ¶ 51.  He denied "using illegal substances and smoking crack cocaine" and testified that he understood that it was "a violation of the Personnel Rules of the City of Chicago as well as the criminal laws of this state to purchase illegal substances."  *Id.* ¶ 84.  He answered "No," when asked the following questions: "Are you currently addicted to crack cocaine?"; "Have you ever been addicted to crack cocaine?"; and "Have you ever been addicted to any drugs?"  *Id.* Marback asked Plaintiff if he was addicted to crack cocaine because he felt that it was relevant to determining whether Plaintiff was a danger to his co-workers and members of the

public. Pl. SOF ¶ 126. Marback did not determine that Plaintiff was a danger, nor did he give Plaintiff a drug test. *Id*. Marback testified that when he asked Plaintiff if he had ever been addicted to cocaine he was referring only to Plaintiff's time as a City employee. *Id*. ¶ 127. Vroustouris acknowledged that only during employment with the City can addiction be a violation of the Personnel Rules. *Id*. Marback testified that when he asked Plaintiff if he had ever been addicted to any drugs, Marback was referring only to Plaintiff's time as a City employee and that the question was relevant to determining whether Plaintiff presented a danger to his co-workers or the public. *Id*. ¶ 128. Marback did not think that the question violated Plaintiff's privacy rights. *Id*. Vroustouris testified that he did not believe that he asked Plaintiff's supervisors whether Plaintiff was impaired in the performance of his job and that he never asked Plaintiff to take a drug test. *Id*. ¶ 134.

Marback asked, as a "lead-off question," whether Plaintiff ever had been arrested at any time prior to May 16, 2004 and the circumstances surrounding the arrest. Pl. SOF ¶ 124. He later testified that he did not have the right to inquire about arrests in Plaintiff's entire lifetime during an interview about one arrest but did not consider it a violation of Plaintiff's right to privacy. *Id*. Vroustouris testified that Plaintiff's arrests prior to employment with the City that did not result in a conviction are not relevant to the performance of Plaintiff's job duties and that he did not believe that applicants to the City were asked if they had ever been arrested. *Id*. Marback asked Plaintiff if he had ever been convicted of a crime. *Id*. ¶ 125. Vroustouris testified that questioning a City employee on this subject is related to their official duties because the conviction could be a violation of the Personnel Rules and could be used to determine if the employee had misrepresented information on the employment application, although he did not

believe that a conviction was a bar to employment with the City. *Id*. Marback had asked about pre-employment convictions before. *Id*.

Marback asked Plaintiff who he resided with. Pl. SOF ¶ 119. Taggart testified this was "background information" and Marback said it was asked because others could be "potential witnesses." *Id*. Vroustouris testified that who a City employee resides with, for how long, what they do for a living, and how long they worked at their jobs were all "legitimate questions." *Id*. Vroustouris, Taggart, and Kirby all have asked that type of question before. *Id*. Marback asked Plaintiff if he and his wife had been separated and whether his stepdaughter, living with Plaintiff, was his wife's child from a previous relationship. *Id*. ¶ 120. Marback said the questions were relevant because they could be potential witnesses. *Id*. Marback asked Plaintiff whether his wife worked outside the home, where she worked, and for how long. *Id*. ¶ 121. Marback testified that he asked that question to determine if she was a City employee and therefore if she was also involved in the potential Personnel Rule violations. *Id*. Marback asked Plaintiff where his mother worked. *Id*. ¶ 122. Marback later testified that the question was asked to determine if Plaintiff's mother was a City employee. *Id*. When Plaintiff responded that she worked for a not-for-profit agency, Marback asked which one because "there's potential that the not-for-profit" that his mother worked for "was a delegate agency" of the City. *Id*. Marback asked Plaintiff whether he had relatives or family members who work for the City, Chicago Transit Authority, Chicago Board of Education or Chicago Park District. *Id*. ¶ 123. He testified that he asked that question to determine whether they were potential witnesses who worked for those agencies and "might have knowledge about his drug use." *Id*.

Vroustouris testified that all of the questions asked of Plaintiff during the interview were "specifically, directly and narrowly related to his official duties." Pl. SOF ¶ 131. According to

Marback and Vroustouris, none of the questions asked during the interview violated Plaintiff's right to privacy. *Id*. ¶¶ 132, 136. In the thousands of investigatory files Vroustouris reviewed, he never determined that an investigator violated an employee's right to privacy. *Id*. ¶ 136.

On the advice of his attorney, Plaintiff refused to answer the following questions about the events of May 16, 2004 on the grounds of self-incrimination in his pending criminal case:

1. Approximately 1:30 p.m. were you in the vicinity of 751 South California Avenue in Chicago?

2. Isn't it true, Mr. Patrick, that on May 16th 2004 at approximately 1:30 p.m., you were in the vicinity of 751 California Avenue in Chicago to purchase crack cocaine?

3. Isn't it true that on that date, time and location you did, in fact, purchase crack cocaine?

4. Isn't it true that Chicago police officers after observing you purchase crack cocaine from another person that they approached you?

5. Isn't it true that Chicago police officers recovered from your right hand a clear plastic bag that contained crack cocaine?

6. Isn't it true that after you were placed under arrest, a search incident to that arrest was conducted by Chicago police officers?

7. Isn't it true that pursuant to that search, the Chicago police officers recovered from your right shoe two additional bags each containing crack cocaine?

8. Why were you at this location at 751 South California on May 16th, 2004 at 1:30 p.m.?

9. Did you make any statements to the police after you were arrested?

10. Were you approached by Chicago police officers on May 16th, 2004 at 1:30 p.m.?

11. You agree that on May 16th, at 1:30 p.m., you were, in fact, at 751 South California?

Def. SOF ¶ 83. He testified at the hearing that he did not answer specific questions about his pending criminal case because he was "still going through a trial with the State" and because the

charged conduct, which occurred on a Sunday at a time when he was "not getting paid from the City," did not have anything to do with his job. *Id*. ¶ 62.

During his interview with Marback and Taggart, Plaintiff explained that he was a member of the "break-out crew" breaking up curbs and gutters. Pl. SOF ¶ 129. He did not operate equipment or machinery as part of his job duties. *Id*. The job duties of a cement worker with the City are defined by a job description. *Id*. ¶ 133.

The only question that Taggart asked Plaintiff during the interview was when the hours of work at CDOT changed during Spring and Winter – a question answered by Plaintiff's union representative. Def. SOF ¶ 96. After the interview, Taggart did not play any role in the IGO's investigation of Plaintiff and did not have any conversations with Marback regarding Plaintiff's case. *Id*. ¶ 97.

Marback found that the information in Plaintiff's file was sufficient to "sustain" the charges against Plaintiff. Pl. SOF ¶ 135. Vroustouris then reviewed the investigatory file, including the complete transcript of the interview. *Id*. After a case went through the review process at the IGO, Vroustouris made the ultimate decision as to whether there was sufficient evidence to recommend discipline. *Id*. His recommendation does not require approval, but the ultimate effectuation of that recommendation does need approval by the City Law Department. *Id*. Vroustouris drafted the IGO Arrest Notification Procedure which stated:

> In the case of an interview which results in no admission by the accused, and after consultation with the investigator's supervisor, the investigator assigned to the case shall track the progress of the criminal case, and shall submit reports for the case file as to the status of the criminal case following each court date. The decision to sustain or not to sustain this type of arrest will be made at the conclusion of the criminal case.

*Id*. ¶ 137. Plaintiff did not make any admissions. *Id*. ¶ 138. Vroustouris did not recall reviewing the tracking sheets when he reviewed Plaintiff's IGO file. *Id*. Vroustouris recommended

termination on February 14, 2005, before Plaintiff's criminal case was concluded on June 5, 2005. *Id.*

*The Termination*

Plaintiff only could have been terminated for "just cause." Pl. SOF ¶ 114. On February 16, 2005, the Assistant Commissioner of CDOT notified Plaintiff by letter that as of that day, he had been placed on paid administrative leave and that he was not to report to work or perform any work duties until further notice. Def. SOF ¶ 20. Plaintiff received a Statement of Charges and Explanation of Evidence ("Statement of Charges") in the mail shortly after March 22, 2005. *Id.* ¶ 21. The Statement of Charges advised Plaintiff that his discharge was under consideration due to violations of the Personnel Rule XVIII, specifically: (i) § 1, ¶ 14 because he received and/or possessed cocaine on May 16, 2004; (ii) § 1, ¶ 15 because he knowingly possessed a controlled substance contrary to 720 ILCS 570/420(c) (sic); (iii) § 1, ¶ 15 because he did not cooperate with the IGO's investigation on July 13, 2004 when he failed to completely answer questions asked by Marback and/or Taggart; (iv) § 1, ¶ 25 because he engaged in insubordinate actions, including failure to carry out a rule, order or directive related to the performance of his duties on July 13, 2004 when he refused to answer the same questions after being ordered to do so by his supervisor; (v) § 1, ¶ 50 because he engaged in conduct unbecoming a public employee on May 16, 2004 by receiving and/or possessing a controlled substance; (vi) § 1, ¶ 50 in that he engaged in conduct unbecoming a public employee on July 13, 2004 by failing to cooperate in the IGO investigation by completely answering questions; (vii) § 1, ¶ 50 because he engaged in conduct unbecoming a public employee on July 13, 2004 when he failed to completely answer questions after being ordered to do so by a supervisor. *Id.* The Statement of Charges also

explained that if Plaintiff wished to respond to the charges, he was required to deliver a written statement to d'Escoto at his downtown office. *Id.* ¶ 22.

On March 30, 2005, Commissioner d'Escoto notified Plaintiff, in a letter dated the same day, that d'Escoto had reviewed the charges against Plaintiff and Plaintiff's response and that effective March 31, 2005, Plaintiff was discharged from his position as Cement Mixer at CDOT. Def. SOF ¶ 23. Plaintiff further was advised that he could request a hearing to contest his discharge before the Personnel Board. *Id.* Plaintiff requested a hearing, and on January 4, 11, and 12, 2006, the Personnel Board conducted hearings at which Plaintiff was represented by counsel of his choosing and testified under oath. *Id.* ¶ 24.

Commissioner d'Escoto testified that it was recommended to him in the IGO's report that Plaintiff be terminated. Pl. SOF ¶ 139. d'Escoto thoroughly discussed and reviewed, page by page, the contents of the IGO file with members of the Section of Personnel. *Id.* d'Escoto alone made the decision to follow the IGO's recommendation, without further approval, and found that Plaintiff had an obligation to answer "all" questions posed during the investigation. *Id.* d'Escoto testified that he had never received any training on employees' rights with respect to investigative interviews or training specifically limited to due process rights. *Id.* He did not make the determination that Plaintiff, in fact, possessed crack cocaine although he understood what the police report said in regard to what they found. *Id.* d'Escoto did not recall whether he had any conversations with anyone about the appropriateness of the questions Plaintiff was asked during the interview. *Id.* ¶ 140. d'Escoto testified that he saw two letters from a representative of Plaintiff's union, one of which requested that the "Department" make no decision regarding Plaintiff's discharge until after an April 2005 hearing in Plaintiff's criminal case. *Id.* He did not review the union contract which the union representative cited as a defense to the charges. *Id.*

*The Personnel Board Hearing*

At the Personnel Board hearing, CPD officer Turner Goodwin testified. Def. SOF ¶ 25. He was one of three officers involved in Plaintiff's arrest on May 16, 2004. *Id*. ¶ 26. He saw Plaintiff tender money to an unknown woman and receive a small object in return. *Id*. Officer Goodwin took the woman into custody, recovering "quite a few bills" in $20 and $5 denominations, while another officer, Officer Brown apprehended Plaintiff. *Id*. ¶¶ 26, 35. Officer Goodwin testified that he saw Officer Brown recover a "small item containing white rock-like substance," about the size of a dime, from Plaintiff. *Id*. ¶¶ 28, 34. Officer Goodwin also testified that once Plaintiff was arrested and searched at the 11th District police station, Officer Brown found "a couple of more" clear plastic bags containing a white rock-like substance, suspected crack cocaine, in Plaintiff's shoe. *Id*. ¶ 29. After being placed under arrest, Officer Goodwin advised Plaintiff of his Miranda rights. *Id*. ¶ 31. Plaintiff informed Officer Goodwin, while at the 11th District station, that he was a city worker, and Officer Goodwin then contacted the IGO to inform them that a City employee had been arrested. *Id*. ¶ 30. Officer Goodwin testified that he later learned that the woman involved in the transaction was Kim Patterson and that he did not know how many bills Plaintiff had handed Patterson. *Id*. ¶ 32. Goodwin further testified that he first saw Plaintiff approach from the south when Plaintiff was about five feet from the car that Patterson was in and then saw him walk back south. *Id*. ¶ 33. Officer Goodwin testified that he may have made a mistake in the original police report by writing that two, rather than one, clear plastic bags were recovered from Patterson. *Id*. ¶ 36. Officer Goodwin's report from May 16, 2004 was submitted into evidence at the Personnel Board hearing. *Id*. ¶ 37. Goodwin testified that the plastic bags recovered from Patterson and Plaintiff were placed in separate "narcotics bags," although he personally handled only the bag

found on Patterson. *Id.* ¶ 38. Officer Goodwin testified that while in the inventory room, he observed Officer Brown pull two, clear plastic bags of suspected crack cocaine from Plaintiff's shoe. *Id.* ¶ 39. While Officer Goodwin added that additional suspected crack cocaine had been recovered from Plaintiff, Officer Brown maintained the narcotics recovered from Plaintiff. *Id.*

Officer Brown testified that he did not observe the hand-to-hand transaction between Plaintiff and Patterson, but when Brown asked Plaintiff to open his hands, Brown observed a small Ziploc bag that contained a "white rock-like substance, suspected crack cocaine." Def. SOF ¶ 40. Brown testified that after Plaintiff was arrested and they were back at the 11th District station, the bag he recovered from Plaintiff was placed in a bag and inventoried. *Id.* ¶ 41. After Brown retrieved the two additional bags from Plaintiff's socks, he inventoried those bags in the same manner and gave those bags to the desk sergeant who put them into a safe. *Id.* At the Personnel Board hearing, the inventory reports were accepted into evidence. *Id.* ¶ 42.

Jill Fresso, an expert in forensic drug chemistry, testified at the Personnel Board hearing. Def. SOF ¶ 43. She identified her lab report, which was admitted into evidence, on the testing of the "four exhibits" contained in three "inventory items." *Id.* The inventory items Fresso tested were the same items inventoried by Officers Goodwin and Brown. *Id.* ¶ 44. Fresso testified that each of the four items tested positive for at least .2 grams of cocaine. *Id.* ¶ 45.

Plaintiff testified that on May 16, 2004, he had entered a store with a $20 bill to make a purchase, lottery tickets, but the clerk advised him the store did not have any change. Def. SOF ¶¶ 57, 63. He then left the store to return to his car and go home when he saw a girl, who had a baby with her, counting money. *Id.* After asking the woman if she could make change for a $20 bill, she said "okay," but before they could finish the transaction, the police officers came "out of nowhere," and grabbed him. *Id.* Plaintiff testified that when he turned away from the woman

before the transaction was complete, it was not to look for the police, but because he was "looking out for his safety." *Id.* ¶ 63. Officer Goodwin testified that the exchange took place "right outside of a grocery store," but that Plaintiff did not tell him that he had given money to the woman to get change. *Id.* ¶ 58. Goodwin further testified that he did not see Plaintiff enter and leave the store before talking to Patterson, but only saw Plaintiff when he was within five feet of the car and was not sure if the store was further from that point. *Id.*

Plaintiff testified that one of the officers removed Plaintiff's wallet and saw that he was a City employee. Def. SOF ¶ 59. Plaintiff further testified the officer then told him that they were watching Patterson, "knew what she was doing," and the Officer then asked him to "help [the officers] out," by having him say that the girl tried to sell drugs to him. *Id.* Plaintiff testified that he refused to implicate the girl and told the Officer he "wouldn't be able to sleep at night if [he] did that." *Id.* Plaintiff denied that police recovered any drugs from him while he was in custody. *Id.* ¶ 60.

At the Personnel Board hearing, the parties stipulated that "on June 5th of 2005 [Plaintiff] pled guilty to the crime of possession of [a] controlled substance, that [Plaintiff] was not convicted thereby however [sic] was placed on probation for a term of 24 months." Def. SOF ¶¶ 46, 65.

After the presentation of evidence and closing arguments, Plaintiff's Personnel Board hearing concluded on January 12, 2006. Def. SOF ¶ 66. The Hearing Officer's Report to the Human Resources Board (i) stated that Plaintiff has provided a "very poor and unbelievable explanation for his contact with Ms. Patterson on May 16, 2004," (ii) found that the testimony of Officers Goodwin and Brown was "much more credible than the obviously after-the-fact, contrived story created by" Plaintiff, (iii) found by a preponderance of the evidence that Plaintiff

was caught with a Ziploc baggie of crack cocaine near 751 South California Avenue, and two more bags of crack cocaine at the 11th District, and (iv) ruled that Plaintiff's actions on May 16, 2004 constituted a violation of Illinois Controlled Substances Act (720 ILCS 570/420(c)), and Personnel Rule XVIII, Section 1, Subsection 3, § 14 and § 15. *Id.* ¶ 67. The Hearing Officer also found that on July 13, 2004, Plaintiff was given his administrative rights, noted that Plaintiff had answered "some background and job-related questions," and concluded that Plaintiff's refusal to answer eleven questions relating to his arrest and alleged drug possession after being advised of his administrative rights and directed to cooperate by Catezone, constituted a violation of Personnel Rule XVIII, Section 1, Subsection 3, § 15 and § 25, and Subsection 5, § 50. *Id.* ¶ 68. At the conclusion of the report, the Hearing Officer recommended Plaintiff's termination from his position of Cement Mixer with the CDOT be upheld. *Id.* ¶ 69.

*Human Resources Board Decision*

On April 11, 2006, the Human Resources Board ("HRB") of the City of Chicago affirmed the decision upholding Plaintiff's termination. Def. SOF ¶ 70. The HRB identified four sections of the Personnel Rules that Plaintiff violated and stated that, "Violation of one or more of these subsections would provide a basis for [plaintiff's] termination." *Id.* Personnel Rule XVIII, entitled "Disciplinary Actions and Procedures for Career Service Employees," provides in relevant part that:

> The City of Chicago has an interest in promotion of order and general welfare of all employees, as well as the general public. The City of Chicago, a public employer, requires that its employees perform their duties in a manner which furthers the efficiency and best interests of the City, and which results in the highest level of public trust and confidence in municipal government.

Def. SOF ¶ 13. That same Personnel Rule states:

> The department head has the authority and responsibility to take disciplinary action against any employee whose conduct does not further the efficiency and

best interests of the City of Chicago. The degree of discipline to be meted out is dependant (sic) on various factors including, but not limited to, the seriousness of the offense, the employee's work record, and (the) (sic) totality of the circumstances. The following conduct, discussed below, when engaged in by an employee, will result in disciplinary action which may include discharge unless the employer, taking all circumstances into account, deems it to be excusable.

As with all the Personnel Rules, it should be noted that if an employee is covered by a Collective Bargaining Agreement, that agreement shall govern in the event of a conflict between any part of this Rule and any such agreement. Employees covered by such agreement can only be discharged for just cause.

Def. SOF ¶ 14. Personnel Rule XVIII identifies fifty-five acts of conduct by City employees which are prohibited. *Id.* One subsection of that Rule, entitled "Criminal or Improper Conduct," prohibits a City employee from any "[i]nvolvement in the illegal sale, delivery, receipt, possession or use of any controlled substance either on or off the job (site) (sic) during hours of employment or non-working time," "[e]ngaging in any act or conduct prohibited by the Municipal Code of the City of Chicago, the Illinois Compiled Statutes, applicable laws of other states, or federal statutes," or engaging in "[i]nsubordinate actions, including failure to carry out a rule, order or directive related to the performance of the employee's duty; assaulting, threatening, intimidating or abusing a supervisor either physically or verbally." *Id.* ¶¶ 15-17. A different subsection of Personnel Rule XVIII, entitled "Violations of City Policy and Rules," prohibits a City employee from engaging in "[c]onduct unbecoming an officer or public employee." *Id.* ¶ 18.

*Inspector General's Powers*

CMC Section 2-56-050, entitled "Conduct of City Officers, Employees, and Other Entities," provides in relevant part that, "[t]he powers and duties of the inspector general shall extend to the conduct of the following: * * * (b) except as limited in this section, all employees of the city government in the performance of their official duties * * *." Def. SOF ¶ 78. Section

2-56-030 of the CMC, entitled "Inspector General – Powers and Duties," provides in relevant part that:

> In addition to other powers conferred herein, the inspector general shall have the following powers and duties:
>
> (a)    To receive and register complaints and information concerning misconduct, inefficiency and waste within the city government;
>
> (b)    To investigate the performance of governmental officers, employees, functions and programs, either in response to a complaint or in the inspector general's own initiative, in order to detect and prevent misconduct, inefficiency and waste within the programs and operations of the city government . . . .

Def. SOF ¶ 81. A further provision of the CMC, entitled "Office of Inspector General," provides in relevant part in Section 2-56-110 that, "All investigatory files and reports of the office of inspector general shall be confidential and shall not be divulged to any person or agency, except to the United States Attorney, the Illinois Attorney General or the States Attorney of Cook County * * *." *Id.* ¶ 86.

> Section 27.1 of the CBA, entitled "Management Rights," provides in pertinent part that:
>
> The Union recognizes that certain rights, powers, and responsibilities belong solely to and are exclusively vested in the Employer, except only as they may be subject to a specific and express obligation of this Agreement. Among these, rights, powers, and responsibilities, but not wholly inclusive, are all matters concerning or related to the management of the Employer's operations and the administration thereof, and the direction of the working forces, including (but not limited to) the right to suspend, discipline, or discharge for just cause . . . [and] to make and enforce reasonable rules and regulations, to maintain order and efficiency . . . .

Def. SOF ¶ 80.

The Association of Inspectors General ("AIG") is a professional organization of inspectors general which adopted "Principles and Standards for Offices of Inspector General." Pl. SOF ¶ 141. The Principles and Standards state that "[d]ue professional care requires * * *

investigations will be conducted with due respect for rights and privacy of those involved." *Id*. Vroustouris was a board member of the AIG when the Principles and Standards were adopted, and sat on the Committee that drafted them. *Id*. Marback also was a member. *Id*. The IGO never adopted the Principles and Standards, but did "follow the spirit of them." *Id*. Training with the AIG did not include the right to privacy in interviews. *Id*. ¶ 142.

Other than the CBA, Section 4.3, and the IGO Arrest Notification Procedures, there are no other rules or regulations with respect to the conduct of employees of the IGO during interviews of employees. Pl. SOF ¶ 143. Vroustouris testified that the only training that the IGO provided regarding the proper scope of an employee interview related to the First Amendment Consent Decree involving religious or political affiliations. *Id*. There are no written guidelines defining the scope of an employee interview. *Id*. Although the IGO provided training to its employees regarding privacy rights of City employees, it did not include "conditioning continued employment on the disclosure of private information." *Id*. ¶ 144. Vroustouris testified that there are constitutional limits to the private information that an employee may be asked at an IGO interview and that the limits depend on the allegations against the employee. *Id*.

Marback testified that he asks what he determines to be "relevant questions" during interviews. Pl. SOF ¶ 145. He was taught in May 2003 that "public employees, just because they work for the government, do not give up their rights to privacy." *Id*. Taggart was never told, nor is he aware that any other investigator ever was told, that it is impermissible to ask certain questions during interviews. *Id*. ¶ 146. Taggart claims that he had discretion concerning the questions to ask, but could not recall any training about the proper scope of interviews. *Id*. Although Taggart did not recall obtaining any information, or reading anything, that defined "official duties," it was his opinion that he could investigate City employees for any conduct

because they are representatives of the City at all times. *Id.* ¶ 147. Kirby never received training regarding whether or not certain questions are appropriate to ask during an interview. *Id.* ¶ 148. Catezone never received training regarding interviews of City employees, or any training on employees' Fifth Amendment rights or an employee's right to privacy in the workplace. *Id.* ¶ 149.

The IGO would receive records for non-employee arrests if they were arrested with a City employee. Pl. SOF ¶ 150. Although Vroustouris acknowledged that it is illegal to refuse to hire someone because they were arrested, he drafted a letter to Mayor Richard Daley recommending that Kim Patterson, a non-employee arrested with Plaintiff, "not be hired as an employee of the City of Chicago in the future" because "it was determined that [Patterson] engaged in conduct in violation" of certain sections of the Illinois Compiled Statutes. *Id.*

### *Testimony of City Employees*

Vroustouris was the IG for the City from November 1989 through July 2005, conducted "hundreds" of interviews, decided whether an investigation would proceed criminally or administratively, and promulgated the rules and regulations for the conduct of investigations. Def. SOF ¶ 93; Pl. SOF ¶¶ 110, 112. Every time that there was an arrest of a City employee that led to a report to the IGO, Vroustouris determined that the case would be "administrative." Pl. SOF ¶ 112. Criminal investigations involved "work related misconduct" – violations of the Personnel Rules, which also happen to be criminal violations. *Id.* Vroustouris decided on or about June 2, 2004, that the investigation of Plaintiff would be administrative in nature because the IGO was not going to seek criminal prosecution and therefore Plaintiff should receive his "administrative rights." Def. SOF ¶ 93. He instructed and trained police officers detailed to the IGO to identify themselves as "Investigators for the Inspector General's Office." Pl. SOF ¶ 111.

d'Escoto served as Commissioner of CDOT from January 19, 2001 through June 21, 2005. Def. SOF ¶ 5. If there was an issue of whether or not to terminate an employee of CDOT for alleged misconduct, d'Escoto made the final decision, although he did not think that he had discretion to disregard the IGO's recommendations and never did. Pl. SOF ¶ 104. d'Escoto was told in the Summer of 2004 that Plaintiff had been arrested for purchasing crack cocaine. *Id.* ¶ 114. At that time, there was no discussion regarding Plaintiff's work performance, sending him for drug testing, or discipline, although d'Escoto could have required such drug testing pursuant to certain procedures. *Id.* ¶¶ 107, 114. To d'Escoto's knowledge, Plaintiff was never observed under the influence of drugs or alcohol while at work. *Id.* Although d'Escoto knew that Plaintiff was arrested for possession in 2004, d'Escoto continued to allow Plaintiff to work until he was put on administrative leave on February 16, 2005. *Id.* ¶ 108.

Marback has been a Deputy IG since November 1, 2000. Def. SOF ¶ 6. As a Deputy IG, he supervised employees and conducted investigations and reported directly to Vroustouris. Pl. SOF ¶ 102. He testified that there was a criminal history report in Plaintiff's file during the interview, and stated that Vroustouris would know how it got there. *Id.* ¶ 109. Taggart served as a Deputy IG from January 16, 2000 to January 16, 2006. Def. SOF ¶ 7. In that position, one of his responsibilities was conducting investigations. *Id.* ¶¶ 6-7. He supervised three investigative groups and reported directly to Vroustouris. Pl. SOF ¶ 103. Marback and Taggart were authorized by Vroustouris to communicate with law enforcement personnel, and such communications did occur. *Id.* ¶ 113.

Catezone has held the title of Dispatcher since 1991. Def. SOF ¶ 8. From 2000 through 2006, he also served as Acting General Foreman for CDOT and in that position he designated the work crews and advised the laborers where to report to work. *Id.* He testified that he would

characterize Plaintiff's work performance as "good," he never observed Plaintiff to be impaired while working, and never knew him to lie. Pl. SOF ¶ 106. Since Catezone became a dispatcher, and in that role, he has never evaluated any employees, has never had any employees report directly to him, and does not have authority to terminate an employee. Def. SOF ¶ 99. Catezone never worked directly with Plaintiff during Plaintiff's employment with the City. *Id*.

William Kirby, who is not a Defendant in this action, was a CPD officer detailed to the IGO as an Investigator Specialist, and conducted "over 100, probably somewhere not much more than 200" investigations. Pl. SOF ¶ 105. He stated that when he was conducting investigations for the IGO, it was customary to identify himself from the IGO but not as a police officer. *Id*. ¶ 111. In certain situations, Kirby would be acting as both an investigator for the IGO and the arresting officer. *Id*. ¶ 109. He investigated Plaintiff and used the CPD computer system, which is not available to the public, to obtain evidence sheets regarding Plaintiff's arrest. *Id*. Vroustouris did not know if police officers detailed to the IGO accessed police databases to collect information after employee arrests, or how Kirby acquired some of the documents relating to the IGO's investigation into Plaintiff's arrest. *Id*. Though acquiring the police documents occurred as a "matter of course" in an IGO investigation, Vroustouris never questioned how they were obtained. *Id*.

## II.     Summary Judgment Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).   In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted).   A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248.   The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact.   See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. at 322.   The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).   In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

III.    **Analysis**

A.      **Count III – Section 1983 - Fifth Amendment against all Defendants**

Plaintiff's Count III arises from his interview with the IGO regarding the events of May 16, 2004.  At that interview, Plaintiff was read his "administrative rights," which informed him that any admission or statement made during the course of the interview, and the fruits thereof, could not be used against him in a subsequent criminal proceeding; that if he refused to answer any questions, he would be ordered to do so by a superior officer; and that his continued refusal to answer questions may serve as a basis for his discharge.  Plaintiff nonetheless chose not to respond to eleven of the questions posed to him.  The Human Resources Board used those refusals as a basis for his termination.  Plaintiff now contends that Defendants unlawfully forced him to choose between relinquishing his Fifth Amendment right against self-incrimination and continued employment.

The parties agree that a governmental entity may compel an employee to answer questions specifically, directly, and narrowly related to the performance of his or her official duties, on pain of dismissal, so long as the employee is given immunity from state or federal prosecution based on the answers provided or the fruits thereof.  See *Uniformed Sanitation Men Ass'n, Inc. v. Comm'r of Sanitation of the City of New York*, 392 U.S. 280, 284-285 (1968); *Garnder v. Broderick*, 392 U.S. 273, 276 (1969).  Defendants maintain that the administrative rights contained an offer of "use immunity" that eliminated any Hobson's choice between preservation of Plaintiff's constitutional rights and his ability to maintain continued employment because any response or evidence derived from his answers could not have been used to prosecute him.  Plaintiff argues that the offer of immunity was insufficient for two reasons:  first, because the scope of questioning itself was not "specifically, directly, and narrowly related to the

performance of [his] duties" and second, because the "use immunity" contained in the administrative rights was insufficient to eliminate coercion.

### 1. Specifically, directly, and narrowly related to his official duties

The parties disagree initially about how to define "official duties."  While Plaintiff contends that the term is limited to his job description, Defendant insists on a broader view encompassing anything contained in the Personnel Rules applicable to City employees.  Where to draw that line for present purposes is irrelevant.  The "specific, direct, and narrow" requirement limits the questions that governments may ask of their employees on pain of dismissal.  Although it may be impermissible to ask questions beyond that scope, terminating an employee for refusal to answer such questions after providing the employee with immunity does not violate the Fifth Amendment.  The Fifth Amendment right against self incrimination presents a counterweight to the power of governments to compel testimony and protects a witness from disclosing that which he or she reasonably believes could be used in a criminal prosecution.  See *Kastigar v. United States*, 406 U.S. 441, 444-445 (1972) (detailing history of privilege).  Its protections do not extend to questions that stray beyond the legitimate scope of governmental inquiry if the answers to those questions would not implicate the witness criminally.  If an employee is terminated for refusing to answer questions that are not related to his or her duties, the basis for any cause of action resides somewhere other than the Fifth Amendment.

Moreover, assuming that questions must be narrowly tailored or run afoul of the Fifth Amendment, the questions asked of Plaintiff met that test.  Pursuant to the Personnel Rules applicable to City employees, Patrick was prohibited from engaging in the "illegal sale, delivery, receipt, possession or use of any controlled substance either on or off the job during hours of employment or non-working time."  All eleven questions that Plaintiff refused to answer

pertained only events relating to his arrest. The questions were directly related to a rule by which Plaintiff must abide as an employee of the City.

Plaintiff also argues that the questions pertaining to periods before he was a City employee were improper. Specifically, Plaintiff points to the fact that Marback asked Plaintiff if he had ever been arrested, had ever been addicted to crack cocaine, or had ever been addicted to any drugs. Marback testified that he intended the question only to cover the time frame of Plaintiff's employment with the City. Plaintiff argues that the questions also could be interpreted as covering pre-employment actions. Regardless of their intended or perceived scope, the questions do not violate the Fifth Amendment. To begin with, as noted above, the immunity provided to Plaintiff prior to the questioning removed any self-incrimination concerns. In addition, Plaintiff answered the questions and did so in the negative. Plaintiff acknowledges the general rule that an individual specifically must invoke his Fifth Amendment rights against self-incrimination. See *Garner v. United States*, 424 U.S. 648, 654 (1976); *Minnesota v. Murphy*, 465 U.S. 420, 427-429 (1984). He nevertheless claims that this case falls under an exception outlined in *Murphy* – the so-called "penalty case" exception. According to Plaintiff, the general rule of invocation is inapplicable when the government requires a person to "forgo the Fifth Amendment privilege by threatening to impose economic or other sanctions." *Murphy*, 465 U.S. at 434-435. But that exception does not apply here. Far from asking Plaintiff to forego his Fifth Amendment rights, the investigators specifically accorded Plaintiff "use immunity" sufficient to eliminate the threat of self-incrimination for answering these questions. Plaintiff's position is difficult to square with the fact that he did refuse to answer other questions. Once Plaintiff refused to answer those questions, he already was in peril of dismissal and would not have been in any greater peril if he had elected not to answer the additional questions. Finally, and

significantly, in each case cited by Plaintiff in support of his "penalty case" theory, the plaintiff had not received immunity.

Finally, Plaintiff's attempt to draw on *Am. Fed'n of Gov't Employees v. U.S. R.R. Ret. Bd.*, 742 F. Supp. 450 (N.D. Ill. 1990) in support of his "specific, direct and narrow" argument is misplaced. The plaintiffs in *American Federation* were governmental employees who did not want to fill out a questionnaire, the completion of which was a condition of employment, that included a question regarding their supply of or use of drugs in the preceding five years. *Id*. at 451-454. The questionnaire also stated that "[w]e may * * * give some of the information to Federal State and local agencies checking on law violations or for other lawful purposes." *Id*. at 451. Far from being a case about the scope of questioning, the court held that there was a Fifth Amendment violation because the employees did not receive sufficient immunity in exchange for their answers about prior drug use, an issue discussed below. See *id*. at 455-456 ("The Board has made no showing that the information gathered through [the questionnaire] would be sufficiently protected from release to law enforcement agencies. Nothing in the record indicates that Board employees with access to [the questionnaire] are precluded from disclosing that information, and the Authority for Release of Information form specifically negates any other agreements made about the release of information").

### 2.    Immunity Provided

The government has a right "to investigate allegations of misconduct, including criminal misconduct by its employees, and even to force them to answer questions pertinent to the investigation, *but if it does then it must give them immunity from criminal prosecution on the basis of their answers*." *Atwell v. Lisle Park Dist.*, 286 F.3d 987, 990 (7th Cir. 2002) (emphasis added) (citations omitted). In providing immunity, a state is treated as a unit; if the IGO insists

that Plaintiff give evidence that might show he had committed a crime, then the state's attorney may not use that evidence to prosecute the Plaintiff on the basis of that evidence. See *id*. This rule applies when, as here, the employee is interrogated by a non-prosecuting agency. See *id*. Before Plaintiff's interview with the IGO began, he responded affirmatively to the following question: "Do you understand that by law any admission or statement made by you during the course of this interview and the fruits thereof cannot be used against you in a subsequent criminal proceeding; do you understand that?" That exchange provided the level of immunity required under *Atwell* and thus sufficed to overcome Plaintiff's Fifth Amendment concerns.

Plaintiff argues that the IGO had no power to give him immunity from prosecution. By this he means that the IGO is unable to provide complete immunity from prosecution, or "transactional immunity." Plaintiff's argument that only transactional immunity could overcome his refusal to answer potentially incriminating questions is untenable, having been rejected by the Supreme Court nearly forty years ago:

> While a grant of immunity must afford protection commensurate with that afforded by the [Fifth Amendment] privilege, it need not be broader. Transactional immunity, which accords full immunity from prosecution for the offense to which the compelled testimony relates, affords the witness considerably broader protection than does the Fifth Amendment privilege. The privilege has never been construed to mean that one who invokes it cannot subsequently be prosecuted. Its sole concern is to afford protection against being forced to give testimony leading to the infliction of penalties affixed to criminal acts. Immunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom, affords this protection.

*Kastigar*, 406 U.S. at 453 (internal citations omitted).

Plaintiff also argues that the CBA offered protection beyond that required under the decisional law. He maintains that even if "administrative rights" are sufficient to override any right to keep silent, the CBA required "Fifth Amendment protections." Assuming *arguendo* that

Defendants were required to read Plaintiff different rights under the CBA,[5] the rights that he did receive were sufficient to defeat any claim for a *constitutional* violation. If the City is not honoring the CBA and providing something short of what is required under the agreement, Plaintiff may have some legal remedy, but not a Fifth Amendment claim. The administrative rights that actually were provided to Plaintiff at the outset of the questioning were co-extensive with the requirements of the Fifth Amendment and therefore Plaintiff has no cause of action on that basis. To the extent that Plaintiff mistakenly believed that he should have received a broader grant of immunity, his refusal to answer the questions is not excused because he was adequately protected from criminal penalties for his answers. See *Atwell*, 286 F.3d at 992 (noting that if an employee was misled into not cooperating with the investigation and then fired for not cooperating, the employer might be guilty of fraud or breach of contract under state law, but there would be no federal violation).

Finally, Plaintiff argues in passing that his Fifth Amendment rights were "effectively eviscerated" because some of the IGO investigators are police officers. He does not, however, indicate why the occupational title or history of the investigators is relevant. The immunity provided Plaintiff prevented the use, *by anyone*, of his statements or the fruits of those statements as evidence in a criminal prosecution. The occupation of the investigators is irrelevant.

---

[5] Section 4.3 (H) states that "if the allegation indicates that criminal prosecution may be probable against said employee, the provisions of this Section shall be inapplicable and said employee will be afforded his constitutional rights concerning self-incrimination prior to the commencement of the interview." Defendants were aware that criminal prosecution was not only probable but had been initiated against Plaintiff. To the extent that Plaintiff may not have received his full "constitutional rights" as contemplated by the terms of the CBA, any error was harmless so far as the Fifth Amendment is concerned, because the grant of immunity provided to Plaintiff was co-extensive with the Fifth Amendment. See *Kastigar v. United States*, 406 U.S. 441, 453 (1972) ("such immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of privilege").

In sum, Plaintiff's Fifth Amendment claim fails because he was not forced to choose between continued employment and preserving his right against self-incrimination. See *Atwell*, 286 F.3d at 991 ("[I]f she refused to answer the question despite the immunity the Fifth Amendment would not protect her from being fired for refusing to cooperate in the investigation"). As Plaintiff himself recognizes, "[p]rivacy is not being protected by the Fifth Amendment – it is only the right to be free of testimonial self-incrimination." *United States v. Sasson*, 334 F. Supp. 2d 347, 366 (E.D.N.Y. 2004). In view of the use immunity conferred on Plaintiff, he could not have incriminated himself by answering the eleven questions.

**B.      Count IV – Section 1983 – Invasion of Privacy**

Count IV alleges that Defendants violated Plaintiff's constitutional right to privacy when they conditioned his continued employment on the disclosure of purely private information during his interview with the IGO. Plaintiff contends that he was forced to respond to personal questions about his family, drug use, and arrest history which were not relevant to the investigation, on fear of termination. The Court grants summary judgment for Defendants on that claim because the constitutional right to privacy has never been interpreted as expansively as Plaintiff's claim would require, Plaintiff suffered no injury as a result of the questions, and to the extent that the Court may be incorrect in finding no violation, Defendants would be entitled to qualified immunity in any event.

**1.      Contours of the constitutional right to privacy**

Courts have recognized two, independent, federal privacy interests: (i) an individual interest in avoiding disclosure of personal matters and (ii) an interest in independence in making certain kinds of important decisions. See *Whalen v. Roe*, 429 U.S. 589, 598-599 (1977); *Pesce v. J. Sterling Morton High Sch.*, 830 F.2d 789, 796-796 (7th Cir. 1987). Only the former (often

termed the "right of confidentiality," "disclosure strand," or "informational privacy") is at issue in this case. Although the scope of the right remains unsettled, Plaintiff points to a comment by the Seventh Circuit "that the federal right of confidentiality might in some circumstances be implicated when a state conditions continued employment on the disclosure of private information." *Pesce*, 830 F.2d at 797. Since that decision, our court of appeals has discussed the types of information covered by the right (see *Denius v. Dunlap*, 209 F.3d 944, 955 (7th Cir. 2000)), but has not yet articulated a precise test for an alleged violation of the right of confidentiality. See *Coffman v. Indianapolis Fire Dep't*, --- F.3d ---, 2009 WL 2525762, at *7 (7th Cir. Aug. 20, 2009). Lacking a precise framework for analysis and acknowledging the unique nature of the present facts, the Court turns to general principles from this area of law to decide whether this one of the "circumstances" to which the court alluded in *Pesce* that may implicate the confidentiality strand of the constitutional right to privacy.

The confidentiality strand of the constitutional right to privacy first was identified by the Supreme Court in *Whalen*, a case in which a group of physicians, pharmacists, and patients challenged a state statute requiring the collection and compilation in a database of all patients who were prescribed certain legal drugs. *Whalen*, 429 U.S. at 591-593. The patients were concerned that, if the information was disclosed, they would be stigmatized, which in turn led the physicians to fear that people would not seek necessary treatment. *Id*. at 595. The Court upheld the constitutionality of the statute, reasoning that there was a low risk of disclosure. *Id*. at 601. Although the Court recognized the "threat to privacy implicit in the accumulation of vast amounts of personal information in computerized data banks or other massive government files," it found that the provisions for protection of the information were sufficient. *Id*. at 602.

The Seventh Circuit first discussed the right in *Pesce* and rejected the plaintiff's attempt to claim a derivative right of privacy. *Pesce*, 830 F.2d at 795-798. The plaintiff, a teacher and school psychologist, was suspended for failure to disclose that another teacher allegedly had engaged in improper behavior with a student. *Id*. at 790. The plaintiff contended that revealing the information would have invaded the student's right of privacy. *Id*. at 795. The court concluded that the state statutory scheme requiring disclosure did not pose a threat to the constitutional right to confidentiality. *Id*. at 797. The court further noted that "a constitutional right to confidentiality does not protect against any and every compelled disclosure * * *." *Id*.

The Seventh Circuit subsequently discussed this strand of the right to privacy in *Denius*, 209 F.3d at 955-958. The plaintiff in that case was a teacher in an institution that relied entirely on government funding. *Id*. at 948. As a condition of his continued employment, the plaintiff was required to sign an authorization permitting "review and full disclosure of all records concerning myself * * * whether the said records are of a public, private or confidential nature." *Id*. at 949. The court of appeals reversed the district court's decision granting the defendants qualified immunity as to any medical records because the state did not provide any justification for the broad scope of the records sought. *Id*. at 957. And although the court affirmed the district court's decision granting qualified immunity as it pertained to plaintiff's financial records, it held that "the sweeping disclosure requirement, lacking any safeguards against misuse or further disclosure, and supported by no justification, infringes [plaintiff's] right of privacy in confidential information." *Id*. at 958.

The Seventh Circuit case that presented the most analogous factual scenario involved a government employee who was required to submit to a psychological examination in order to keep her job. *Greenwalt v. Indiana Dept. of Corrs.*, 397 F.3d 587, 588 (7th Cir. 2005). After

undergoing the examination, the plaintiff alleged that the questions unlawfully inquired into details of her personal life. *Id*. Although Plaintiff's claim was brought pursuant to the Fourth Amendment, the court noted in dicta that "the administration by public officers of a particularly intrusive, and humiliating, psychological test is a deprivation, without due process of law, of an interest in privacy that is an aspect of the liberty protected by the due process clauses of the Fifth and Fourteenth Amendments." *Id*. at 592.

Plaintiff also relies heavily on the *American Federation* decision discussed above. In that case, the employees sought an injunction from answering a questionnaire including the question, "Do you now use or supply, or within the last 5 years have you used or supplied marijuana, cocaine, narcotics, hallucinogenic, or other dangerous or illegal drugs?" 742 F. Supp. at 453. The employees also were asked about excessive alcohol use. *Id*. The government was free to release the answers provided to "the duly accredited representative of any authorized agency * * *." *Id*. at 454. The court balanced the government's need for that information against the applicants' interest in keeping that information private and concluded that the disclosure was excessive in view of the nature of the positions applied for (computer operator) and the government's failure to advance sufficient justifications for the inquiry. *Id*.

> The Board would require its employees to divulge to it (and, through the release form, to any other interested federal agency) the most personal sorts of information. While not all the information sought actually implicates the Fifth Amendment, all of it implicates the type of interest which the Fifth Amendment protects. That is, the right to keep certain information from the government, particularly when the government has expressed an intent to use that information as a basis for taking some adverse action against the individual making the disclosure.

*Id*. at 455.

With that legal background in place, the Court concludes that the right of informational privacy, as it has been construed in this Circuit, does not extend to the circumstances of this case.

As an initial matter, the Court need not rely on the framework set forth above to grant Defendants' summary judgment motion in regard to the questions asked about Plaintiff's family. Plaintiff was asked with whom he lived; if he and his wife had been separated; and whether Plaintiff's stepdaughter, who lived with Plaintiff, was his wife's child from a previous relationship. The only case cited in support of Plaintiff's position, *Briggs v. North Muskegon Police Dept.*, 563 F. Supp. 585, 589 (W.D. Mich. 1983), involved a police officer's termination for living with a woman to whom he was not married. But that case is inapposite, for it involved the other strand of the right of privacy – the interest in independence in making certain kinds of important decisions. It had nothing to do with the disclosure strand or any concern over answering questions on fear of termination. In any event, the questions asked of Plaintiff about his family all were permissible background questions that did not run afoul of a constitutional right to privacy. Defendants testified that they wanted to know who lived with Plaintiff to determine if any other potential witnesses existed. And the questions regarding Plaintiff's marriage and his stepdaughter were asked to clarify an answer that was given earlier in the interview.[6]

The remaining questions pertained to Plaintiff's drug use and arrest history; specifically, he was asked whether he was currently addicted to crack cocaine; whether he had ever been addicted to crack cocaine; whether he had ever been addicted to any drugs; and if he had ever been arrested prior to May 16, 2004. The Court can further narrow the inquiry by eliminating the first and last question as potentially violating his constitutional right to privacy. If Plaintiff was addicted to crack cocaine at the time of the questioning, he would have been in violation of the Personnel Rules – and considering his arrest for purchasing crack cocaine, any possible

---

[6] After "guessing" that he had been married for ten years, Plaintiff stated that his stepdaughter was three years old. The investigator then asked Plaintiff if "there was a separation at some time in between there?"

addiction issues were a matter of legitimate and proper concern for Defendants. See *Whalen*, 429 U.S. 600-602. Questions about prior arrests did not violate any right to privacy because there is no legitimate expectation of privacy as to an arrest that becomes part of the public record. See *Levin v. Board of Educ. of City of Chicago*, 470 F. Supp. 2d 835, 842 n.7 (N.D. Ill. 2007); see also *Nunez v. Pachman*, --- F.3d ---, 2009 WL 2605376 (3d Cir. Aug. 26, 2009) (concluding that there was no privacy interest in expunged criminal records under the federal constitution).

Therefore, the only questions that conceivably could have violated Plaintiff's right to privacy were those asking whether Plaintiff ever had been addicted to crack cocaine or any other drugs.[7] However, none of the cases cited by the parties or located by the Court support a right to privacy so expansive as to encompass that line of questioning. The only instance in which the Seventh Circuit held that the right to privacy was violated involved the release of almost limitless information with no suggested or conceivable relation to the plaintiff's employment and no reason to believe that the information requested would reveal information that could have affected his job duties. See *Denius*, 209 F.3d at 958. The same cannot be said of the information at issue here. Plaintiff was asked the questions in an investigative setting following his arrest for purchasing narcotics and the questions were tailored to the reason for the investigation – namely, Plaintiff's violation of Personnel Rules. In addition, the presence of other factors which courts have found in connection with violations of the right of privacy are lacking in this case. Unlike in *American Federation*, and as discussed in *Whalen*, Plaintiff's answers were not to be compiled or disseminated to other federal agencies. While Plaintiff is correct that pursuant to the CMC,

---

[7] As noted above, Marback testified that he intended the question to cover only the time period when Plaintiff was employed by the City while Plaintiff thought it covered pre-employment conduct. In granting Defendant's motion, the Court considers it in the light most favorable to Plaintiff and therefore assumes that it covered his actions before he was employed by the City.

Defendants could have forwarded information to three prosecuting agencies, Plaintiff was granted use immunity and there is no indication that the information actually was sent on to any other agency, nor is there any reason to think that it would have been in light of Plaintiff's responses.

Plaintiff contends that the asking of the question alone is sufficient to constitute a violation when his failure to answer could have resulted in his discharge. In other words Defendants "conditioned employment on the disclosure of private information." *Pesce*, 830 F.2d at 797. But even assuming that there is a limit to questions that can be asked to government employees in an investigative setting,[8] the Court concludes that this is not one of the "circumstances" contemplated in *Pesce*.

Plaintiff initially answered the questions without objection after having had the benefit of (i) the advice of counsel prior to the questioning in regard to what questions Plaintiff properly could answer and (ii) the presence of union representation during the questioning itself. In view of Plaintiff's refusal to answer other questions, he already was already in peril of termination. In addition, Plaintiff answered the questions in the negative and suffered no tangible injury for having done so. Plaintiff was discharged for reasons having nothing to do with the questions to which he now objects or the answers that he gave to those questions. A constitutional tort requires that the plaintiff suffer an injury. Here, Plaintiff has not alleged that he suffered one beyond the mere disclosure he had *not* been addicted to drugs or arrested. See *Siggers-El v.*

---

[8] Although arising in a different context, there is some suggestion that the mere asking of questions alone is insufficient to give rise to potential liability. See *Levin*, 470 F. Supp. 2d at 841 ("Without disclosure, there is no violation of the constitutional right to privacy") (citing *Nat'l Fed'n of Employees v. Greenberg*, 983 F.2d 286, 294 (D.C. Cir. 1993) (noting that "questions do not invade privacy, answers do")).

*Barlow*, 412 F.3d 693, 701 (6th Cir. 2005).  In these circumstances, it is hard to see how a disclosure of that kind could have caused any injury.[9]

Hypothetically, there appear to be two ways in which Plaintiff could have suffered an injury from this line of questioning:  (i) refusing to answer or (ii) admitting that he had been addicted to drugs or had been arrested.  No additional injury could have come from the first hypothetical beyond the injury that he already suffered from his refusal to answer the eleven questions despite having been granted immunity.  And if the second scenario had played out, and Plaintiff was discharged for answering positively, he may have had a claim for termination on the basis of pre-employment conduct.  But that is not what transpired.  Alternatively, if and when a City employee is asked a question that he or she believes impinges on the constitutional right to privacy and that person is discharged for refusing to answer on that basis, the employee might be in position to state a valid claim for invasion of privacy.  But, again, that is not the situation before the Court.

Plaintiff's attempt to analogize this case to *American Federation* is unavailing for several reasons.  Although the questions regarding Plaintiff's drug use may have covered a greater period of time than the questions asked in *American Federation*, the questions here were targeted to Plaintiff.  There was no indication that the plaintiffs in *American Federation* had used or bought drugs.  Here, by contrast, the questions were asked of Plaintiff only after he was arrested for purchasing drugs in violation of the Personnel Rules.  In addition, the court in *American Federation* was concerned with the dissemination of the information provided and the

---

[9] In fact, Plaintiff may simply lack standing to bring this claim.  See Rotunda & Nowak, Treatise On Constitutional Law § 18.30(a), at 205 (4th ed. 2008) (citing *Laird v. Tatum*, 408 U.S. 1 (1972), rehearing denied 409 U.S. 901 (1972)) ("[U]nless an individual could show identifiable harm from government investigation or data collection practices that individual would not have standing to maintain a suit to limit such practices").

absence of an explicit grant of immunity.  Here, even absent the immunity, the information that Plaintiff provided could have been transmitted only to three prosecuting agencies, while the information in *American Federation* could have ended up in the hands of any federal agency. And, more importantly, unlike in *American Federation*, Plaintiff here received a clear grant of use immunity before he was forced to respond.

In the final analysis, the Court agrees with the Fifth Circuit's statement that "[a]lthough in retrospect some questions may be determined to be irrelevant and not within the government's proper sphere of concern, police officers must have the freedom *to at least ask* the questions they believe will aid them in the investigation." *Ramie v. City of Hedwig Village*, 765 F.2d 490, 493 (5th Cir. 1985) (emphasis added).  The investigators asked questions that at least were related to the investigation, even if they were beyond the scope relevant to his official duties.  If Plaintiff found them improper, he could have objected, and if he was terminated for his refusal to answer, he might have been in a position to bring a claim.

### 2. Qualified immunity

In addition, even if the questions did violate Plaintiff's right to privacy, the Court finds that several of the Defendants are not liable in their individual capacity and in any event all of the individual Defendants cannot be liable under the doctrine of qualified immunity.  To begin with, Catezone and d'Escoto contend that they should be dismissed because they neither caused nor participated in the constitutional deprivation.  Plaintiff counters that "direct participation" is not required and individual liability attaches in the Section 1983 context if he or she "acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the deprivation occurs at her discretion or with her knowledge and consent." *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982).  Catezone's role in the alleged violation consisted of

instructing Plaintiff to answer the questions posed to him in the investigation. There is no suggestion that Catezone knew at the time of his instruction that Marback would stray beyond Plaintiff's period of employment. Plaintiff nevertheless contends that liability can attach because Catezone made no inquiry about what was about to be asked. But Plaintiff has not pointed to any decisions requiring someone in Catezone's position to determine beforehand exactly what questions an investigator will ask. Regardless, at the most Catezone was negligent, which is insufficient to find him liable.

d'Escoto's role in Plaintiff's alleged right to privacy violation is even more tenuous. According to Plaintiff, d'Escoto "reviewed all of the conduct which is the basis of this cause, accepted the IGO recommendation with no respect for the Constitutional violations, and terminated Plaintiff." Plaintiff termination had nothing to do with the questions or answers giving rise to the alleged privacy violation. Plaintiff answered "no" when asked if he had previously been addicted to drugs or abused alcohol. d'Escoto's role simply was to determine whether cause existed; he found that it did based on the arrest and refusal to cooperate. It was not his job to review every interview for potential constitutional violations that did not impact the discharge decision.

In any event, even if Defendants' actions were unlawful, they nevertheless would be entitled to qualified immunity because the constitutional right to privacy in this setting was not clearly established at the time of the investigation. Qualified immunity should be granted when the officials' conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The purpose of qualified immunity is to provide reasonable notice to government officials that certain conduct violates constitutional rights before a plaintiff can subject them to liability. *Hope*

*v. Pelzer*, 536 U.S. 730, 739 (2002). The contours of the right must be sufficiently clear that a reasonable official would understand that his actions violate that right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Reasonable notice does not require that there be a "fundamentally similar" case, and a government official can be on notice that his conduct violates constitutional rights even in "novel factual situations." *Narducci v. Moore*, 572 F.3d 313, 318 (7th Cir. 2009). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Plaintiff bears the burden of demonstrating that the constitutional right allegedly violated was clearly established before Defendants acted or failed to act. See *Gossmeyer v. McDonald*, 128 F.3d 481, 495-496 (7th Cir. 1997) (citation omitted).

The dispute over qualified immunity turns on whether the right to privacy that Defendants are alleged to have violated was clearly established at the time of Plaintiff's alleged injury. Plaintiff relies, again, on *American Federation* for the proposition that "these particular inquiries" violate the right to privacy. For all of the reasons stated above, *American Federation* is distinguishable and could not have provided notice to Defendants that the questions asked of Plaintiff violated his constitutional right of privacy. If this case involved pre-employment questionnaires, Plaintiff may have a better argument that the right was clearly established. However, the questions asked were made in the course of an investigation and the questions were germane to the subject matter of the investigation. Recent cases from the Seventh Circuit reveal that the right of privacy when questioning an employee was not "clearly established" at the time of the questioning, nor is it appreciably clearer even today. To the contrary, the Seventh Circuit has observed that "[p]erhaps it could even be argued that the administration by public officers of a particularly intrusive, and gratuitously humiliating, psychological test is a deprivation, without

due process of law, of an interest in privacy that is an aspect of the liberty protected by the due process clauses of the Fifth and Fourteenth Amendments." *Greenwalt*, 397 F.3d at 592. The court further has opined that "[t]here is a hint in [*Whalen*] that the 'interest in nondisclosure of private information' might indeed constitute a part of that liberty." *Id*. Yet, the court also noted that it "need not wrestle the issue to the ground" – and thus did not and has not done so since. *Id*. The uncertainty reflected in *Greenwalt* supports the conclusion that, in this context, the right posited by Plaintiff was not "clearly established" and that Defendants therefore are entitled to qualified immunity for asking the questions that they posed to Plaintiff.

Finally – as to the federal claims in this lawsuit – the City, therefore cannot be liable under *Monell* because Plaintiff suffered no constitutional injury. See *Houskins v. Shehan*, 549 F.3d 480, 493 (7th Cir. 2008) (where plaintiff fails to establish deprivation of a constitutional right, *Monell* claims must also fail); *Alexander v. City of South Bend*, 433 F.3d 550, 557 (7th Cir. 2006) (finding that a municipality defendant cannot be liable under *Monell* for a policy or custom of inadequately training or supervising its police officers, unless the defendant violated a constitutional guarantee); *Aguilera v. Baca*, 510 F.3d 1161, 1167, 1174 (9th Cir. 2007) (noting that if no constitutional violation occurred, the court need not consider qualified immunity or a claim brought pursuant to *Monell*); *Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2007) (noting that if a jury found no constitutional violation by individual defendants, a county could not have been found liable under *Monell* for an allegedly unconstitutional custom or policy); *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("[B]ecause the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct").

**C.      Counts I and II – State Law Claims for Certiorari and Mandamus**

For the reasons stated above, the Court grants Defendants' summary judgment motion [107] and denies Plaintiff's cross-motion for summary judgment as to Counts III and IV of Plaintiff's amended complaint.  Because that disposition results in the dismissal of all claims over which the Court has original jurisdiction (see 28 U.S.C. § 1367(c)(3)), the Court must address whether to retain jurisdiction over the state law claims in Counts I and II of the amended complaint.

As the Seventh Circuit consistently has stated, "it is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999); see also *Williams v. Rodriguez*, 509 F.3d 391, 404 (7th Cir. 2007) ("As a general matter, when all federal claims have been dismissed prior to trial, the federal court should relinquish jurisdiction over the remaining pendent state claims"); *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251 (7th Cir. 1994) ("the general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits").  Yet the court of appeals has discussed "three well-recognized exceptions" to the general rule that "when all federal-law claims are dismissed before trial, the pendent claims should be left to the state courts." *Wright*, 29 F.3d at 1252.  As the court has explained, occasionally there are "unusual cases in which the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point to a federal decision of the state-law claims on the merits." *Id*.

The first example that the Court discussed occurs "when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court." *Wright*, 29 F.3d at

1251.  That concern is not present here, however, because Illinois law gives Plaintiff one year from the dismissal on jurisdictional grounds of state law claims in federal court in which to refile those claims in state court.  See 735 ILCS 5/13-217; see also *Sharp Electronics Corp. v. Metropolitan Life Ins. Co.*, --- F.3d ---, 2009 WL 2501789, at *9 (7th Cir. Aug. 18, 2009); *Davis v. Cook County*, 534 F.3d 650, 654 (7th Cir. 2008).

The second exception recognized in *Wright* applies when "substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort."  29 F.3d at 1251 (quoting *Graf v. Elgin, Joliet & E. Ry. Co.*, 790 F.2d 1341, 1347-48 (7th Cir. 1986)).  Here, although the Court has devoted substantial resources to the disposition of the federal claims on summary judgment, it has not delved deeply into the state law claims.  See *Davis*, 534 F.3d at 654 ("the district court disposed of the federal claims on summary judgment, and so 'substantial judicial resources' have not yet been committed to the case").  Moreover, the lion's share of the attention that thus far has been given to the state law claims took place in the context of the ruling on Defendants' motion to dismiss [36], which was issued by Judge Leinenweber prior to the transfer of the case to this Court's docket.  Thus, while there clearly are instances in which "a district court *should* exercise supplemental jurisdiction over pendent state law claims for reason of judicial efficiency" (*Miller Aviation v. Milwaukee County Board of Supervisors*, 273 F.3d 722, 732 (7th Cir. 2001)), this is not one of them.

The third circumstance to which the court of appeals has pointed in which disposition of pendent state law claims may be appropriate "occurs when it is absolutely clear how the pendent claims can be decided."  *Wright*, 29 F.3d at 1251.  For example, "[i]f the district court, in deciding a federal claim, decides an issue dispositive of a pendent claim, there is no use leaving the latter claim to the state court."  *Id*.  In addition, if the state-law claims are "patently

frivolous," they should be resolved right away in the federal court. *Id*. However, "[i]f the question whether a state-law claim lacks merit is not obvious, comity concerns may dictate relinquishment of jurisdiction." *Id*. Here, although the state and federal claims arise out of the same factual scenario, the legal analysis is very different and the fact that the Court has determined that Plaintiff's constitutional claims cannot survive summary judgment says very little about the proper disposition of state law claims asking the Court to issue a writ of certiorari directed at the City of Chicago Personnel Board and a writ of mandamus ordering the City to comply with certain rules and to reinstate Plaintiff to his prior position. Both of those requests implicate state law processes – certiorari and mandamus – with which federal courts do not often deal and as to which the proper disposition is "not obvious" on the basis of the Court's limited review of the claims to date. *Id*.

In sum, the Court concludes that none of the exceptions to the "usual practice" applies in this case. Accordingly, the Court dismisses *without prejudice* the state law claims asserted in Counts I and II of Plaintiff's amended complaint.

## IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment [107] is granted and Plaintiff's cross-motion for summary judgment is denied as to the federal claims in Counts III and IV of Plaintiff's amended complaint. The state law claims raised in Counts I and II of Plaintiff's amended complaint are dismissed without prejudice.

Dated:  September 30, 2009
_____
Robert M. Dow, Jr.
United States District Judge